# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **THOMASINE M.[1] o/b/o B.D., a minor child,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Civil Action No. 7:21-cv-00643** |
| ) | |
| **KILOLO KIJAKAZI,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

Plaintiff Thomasine M. ("Thomasine"), on behalf of B.D, a minor child, filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding B.D. not disabled and therefore ineligible for Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. § 1381-1383f. Thomasine alleges that the Administrative Law Judge ("ALJ") erred by finding that B.D. had a less than marked limitation in the domain of acquiring and using information.

I conclude that substantial evidence does not support the Commissioner's decision. Accordingly, Thomasine's Motion for Summary Judgment is **GRANTED in part** (Dkt. 18), the Commissioner's motion for summary judgment is **DENIED** (Dkt. 20), and this case is **REMANDED** to the Commissioner for further administrative proceedings consistent with this opinion.

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

**STANDARD OF REVIEW**

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that B.D. was not disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

However, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"); see also Monroe v. Colvin, 826 F.3d. 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must

---

[2] Under the Act, a claimant under the age of eighteen is considered "disabled" for purposes of eligibility for SSI payments if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

"build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often) (citation omitted). I find that remand is appropriate here because the ALJ's opinion regarding B.D.'s limitation in acquiring and using information is not supported by substantial evidence.

## CLAIM HISTORY

Thomasine, on behalf of B.D, protectively filed for SSI in November 2017, claiming that B.D.'s disability began on August 24, 2010, due to scoliosis and curvature of the spine, which require him to wear a back brace at night.[3] R. 106, 118. At the time Thomasine filed for SSI, B.D. was a school-age child, and at the time of the ALJ's decision, he was an adolescent. R. 18. The state agency denied Thomasine's applications at the initial and reconsideration levels of administrative review. R. 106–15, 117–34. On February 6, 2020, ALJ Jeffrey Schueler held a hearing to consider Thomasine's disability claim on behalf of B.D. R. 46–75. Counsel represented B.D. at the hearing, which included testimony from both B.D. and Thomasine, who is B.D.'s mother. On June 3, 2020, the ALJ entered his decision and denied Thomasine's claim for benefits on behalf of B.D. R. 139–57. On November 6, 2020, the Appeals Council granted Thomasine's request for review and remanded the case to the ALJ for further proceedings. R. 163–64. On March 24, 2021, the ALJ held another hearing to consider Thomasine's disability claim on behalf of B.D. R. 78–101. On June 11, 2021, the ALJ entered his decision and again denied Thomasine's claim for benefits on behalf of B.D. R. 17–37.

---

[3] The relevant period begins in November 2017, as SSI benefits are not payable for any period prior to the filing of an application.  See 20 C.F.R. §§ 416.202, 416.501.

The Social Security regulations provide a three-step sequential evaluation process for determining whether a minor is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the claimant is engaged in substantial gainful activity; if so, the claimant is not disabled. Id. § 416.924(a), (b). Next, the ALJ must determine whether the claimant suffers from "an impairment or combination of impairments that is severe," if not, the claimant is not disabled. Id. § 416.924(a), (c). To qualify as a severe impairment, it must cause more than a minimal effect on the claimant's ability to function. Id. § 404.924(c). If an impairment is "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations," then it is not severe. Id. If the claimant has a severe impairment, the analysis progresses to step three where the ALJ must consider whether the claimant's impairment or combination of impairments meets, medically equals, or functionally equals a listing. Id. § 416.924(a), (d). If the claimant has such impairment, and it meets the duration requirement, the claimant is disabled. Id.

The ALJ's June 11, 2021 decision analyzed B.D.'s claim under the three-step process. R. 17–31. The ALJ found that B.D. was not engaged in substantial gainful activity and suffered from the severe impairments of scoliosis and a learning disorder. R. 18. However, the ALJ concluded at step three that B.D.'s severe impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id.

When conducting this step three analysis, the ALJ must consider the six relevant domains[4] of functioning to determine whether B.D.'s severe impairments functionally equal a

---

[4] The domains "are broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1).

4

listed condition: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). In order for a claimant to be found disabled, marked limitations must be assessed in at least two domains or an extreme limitation assessed in one domain. Id. § 416.926a(a). "Marked" limitation is defined as "more than moderate" but "less than extreme." Id. § 416.926a(e)(2)(i) A minor has a "marked" limitation in a domain when his impairment(s) interferes seriously with his ability to independently initiate, sustain, or complete activities. Id. Extreme limitation is defined as "more than marked." Id. § 416.926a(e)(3)(i). While extreme limitation is the rating given to the worst limitations, it does not necessarily require a total lack or loss of ability to function. Id.

Here, the ALJ, after considering the six functional "domains" concluded that B.D.'s impairments, either individually or in combination, were not functionally equivalent to a listed condition. R. 18. Specifically, the ALJ considered listing 101.15 (disorders of the skeletal spine resulting in compromise of a nerve root), listing 101.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), and listing 112.11 (neurodevelopmental disorders). The ALJ concluded that B.D. had no limitations in the domains of interacting and relating with others, moving about and manipulating objects, and the ability to care for himself; less than a marked limitation in the domains of acquiring and using information and health and physical well-being; and a marked limitation in attending and completing tasks. R. 21, 29–36. Accordingly, the ALJ found that B.D. did not have an impairment or combination of impairments that resulted in either "marked" limitations in two domains of functioning or "extreme" limitation in one domain of functioning. R. 36. Thus, the ALJ concluded that B.D. was not disabled. Thomasine appealed the

ALJ's decision, and on November 17, 2021, the Appeals Council denied her request for review. R. 1–4. This appeal followed.

## ANALYSIS

Thomasine challenges the ALJ's finding that B.D.'s impairments do not functionally equal a listing, and specifically argues that the ALJ erred both by finding that B.D. had a less than marked limitation in the domain of acquiring and using information and in assessing his symptoms and allegations.

### A. Medical History, School History, and Opinion Evidence

1. Medical Treatment and Learning Accommodations

B.D. was five years old on his alleged onset date and sixteen years old when the ALJ issued his decision. From a young age, B.D. has regularly undergone assessments to determine his cognitive functioning. R. 391, 774, 823. The results consistently showed that B.D. cognitively functioned below the average range for his peers. R. 391–92, 537, 776, 823–24. B.D. had an Individualized Education Program ("IEP") beginning in March 2017 and received accommodations such as extended time to complete assignments and small group testing. R. 409, 428.

B.D. also regularly followed with an orthopedist for scoliosis, but by February 2019, the orthopedist reported that B.D.'s scoliosis was not severe, would not directly lead to back pain, and would not "affect him in getting a job, activities of daily living, sports, or any activities at all." R. 749. B.D. and Thomasine denied any concerns about B.D. during well-child checks. During a well-child check in June 2018, Thomasine denied having any concerns about B.D.'s health and even noted that B.D. was reading and doing math at grade level and had "good

concentration." R. 762–63. During a well-child check in April 2019, B.D.'s provider noted that B.D. liked school and got good grades. R. 760.

    2. <u>Medical Opinions</u>

In April 2018, state agency doctor Leslie Ellwood, M.D., reviewed the record and found that B.D. had no limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself. R. 109–10. Dr. Ellwood concluded that B.D. had a less than marked limitation in health and physical well-being. R. 110. The ALJ found Dr. Ellwood's opinion unpersuasive. R. 28. The ALJ reasoned that Dr. Ellwood did not examine B.D. and cited to little evidence in the record. <u>Id.</u> Further, the ALJ reasoned that Dr. Ellwood's opinion was inconsistent with the record, which supports more limitations. <u>Id.</u>

In October 2018, state agency doctor Joseph Familant, M.D., and state agency psychologist Leslie Montgomery, Ph.D., reviewed the record and found that B.D. had no limitations in the domains of interacting and relating with others and moving and manipulating objects and less than marked limitations in acquiring and using information, attending and completing tasks, caring for himself, and health and physical well-being. R. 127–28. The ALJ found this opinion persuasive. R. 29. The ALJ reasoned that "while neither examined the claimant, they cited to evidence in support of their opinions, and they remain consistent with the record as a whole[.]" <u>Id.</u>

In July 2016, B.D. had a consultative examination with Jeffrey Luckett, Ph.D., that included a mental status examination. R. 664–69. Dr. Luckett noted that B.D. had deficiencies in verbal comprehension, fluid reasoning, working memory, and processing speed. R. 668. Dr. Luckett noted that B.D.'s lack of interest in participation on some sections of the examination

"likely acted as an anchor to pull down his Full Scale IQ[.]" R. 669. In September 2018, B.D. had a consultative examination with Betty Gillespie, Ph.D., that included a mental status examination. R. 736–41. Dr. Gillespie noted that B.D. had "grossly average nonverbal cognitive abilities, but much worse verbal cognitive skills and abilities." R. 740. Dr. Gillespie further noted that B.D. struggled with mental arithmetic problems and tested at a moderately impaired level and that B.D. read at an ending fourth to ending fifth grade level. Id. The ALJ concluded that to the extent Dr. Luckett's and Dr. Gillespie's consultative examinations constitute opinions, both were persuasive. R. 29.

      3.   <u>Learning Disability and IEP Evaluations</u>

The record contains several evaluations associated with B.D.'s learning disability and IEPs. In June 2012, Amanda Newkirk, Ed.S., concluded that B.D. showed signs of a significant learning disability and demonstrated limited verbal communication and verbal comprehension. R. 774–78. Ms. Newkirk also concluded that B.D.'s nonverbal reasoning skills were in the average range but that his verbal comprehension and processing speed were extremely low. R. 775. In March 2018, Laura Leonard, M.A., SSP, concluded that B.D.'s IQ is in the low range of ability and that his cognitive abilities range from average to very low compared to his peers. R. 442–44. However, Ms. Leonard noted that B.D.'s Verbal Comprehension Index significantly improved from his previous evaluation. R. 443. Also in March 2018, Emily Wycoff, M.Ed., CCC-SLP, concluded that B.D. had strengths in articulation, fluency, and voice, and weaknesses in receptive and expressive language. R. 462–63.

The ALJ analyzed the opinions of Ms. Newkirk, Ms. Leonard, and Ms. Wycoff collectively. The ALJ found the opinions to be generally unpersuasive. R. 26. The ALJ reasoned that the opinions are inconsistent with later evidence showing B.D.'s trouble with written

8

expression. Id. Further, the ALJ reasoned that their opinions were unsupported because they did not review the entire medical record prior to formulating an opinion. Id. The ALJ also noted that the opinions are inconsistent with evidence that B.D. can "complete tasks like going to a store with a list and riding public transportation." Id.

    4.  Teacher Questionnaires

The record also contains multiple teacher questionnaires, all of which the ALJ specifically discussed. Courtney Whitehead, B.D.'s middle school math teacher, and Courtney Knox, B.D.'s middle school special education teacher, completed a Teacher Questionnaire in September 2018 and found that B.D. had a serious problem in comprehending and doing math problems, learning new material, recalling and applying previously learned material, and applying problem solving skills in class discussions. R. 654–61. Ms. Whitehead and Ms. Knox noted that B.D. "shuts down when things have multiple steps or [get] difficult." R. 655. The ALJ found this opinion unpersuasive because it is inconsistent with the record that B.D. can "engage in practical life skills, such as performing household chores, going shopping at the store with a list, and navigating public transportation." R. 28. The ALJ further reasoned that more recent evidence suggests that B.D. "was not as limited and is able to express his ideas verbally in a clear manner, but continued to have some limitation with written expression." Id.

      Laura Duncan, B.D.'s high school English teacher, completed a Teacher Questionnaire in January 2020 and found B.D. had a very serious problem comprehending and doing math problems and a serious problem expressing ideas in written form. R. 501–08. Ms. Duncan also noted obvious and slight problems in the remaining categories. R. 502. The ALJ found this opinion somewhat persuasive but reasoned that Ms. Duncan's opinion is inconsistent with the record, which shows that B.D. is not as limited as Ms. Duncan stated in her Teacher

Questionnaire. R. 27. Further, the ALJ reasoned that more recent evidence shows that B.D. could engage in practical tasks. R. 28.

Danielle Stow, B.D.'s high school algebra teacher, completed a Teacher Questionnaire in January 2020 and found B.D. had a serious problem comprehending and doing math problems, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. R. 493–500. Ms. Stow further found that B.D. had an obvious problem in comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, and understanding and participating in class discussion. R. 494. Ms. Stow noted that B.D. needs assistance daily to complete tasks in class and struggles to recall previously taught and reviewed content. Id. The ALJ found this opinion somewhat persuasive and reasoned that Ms. Stow's opinion regarding B.D.'s serious limitation in acquiring and using information is less consistent with more recent evidence. R. 27.

Ashley Spradlin, B.D.'s high school Microsoft Office: Applications teacher, completed a Teacher Questionnaire in February 2020 and found B.D. had no problem understanding and participating in class discussion, a slight problem recalling and applying previously learned material, and an obvious problem learning new material. R. 545–52. Ms. Spradlin noted that B.D. received extra help in her class. R. 546. The ALJ found Ms. Spradlin's opinion persuasive because while B.D. "exhibited some difficulty during examinations with maintaining focus, he played sports and performed household chores, both of which require some level of functioning" in the domain of acquiring and use information. R. 26.

Karen Guffey, B.D.'s high school special education teacher, completed a Teacher Questionnaire in March 2021 and noted that while B.D. "expresses his ideas verbally and in a clear manner[,]" he "does not always comprehend new material or directions." R. 644–51. Ms.

Guffey found that B.D. had an obvious problem understanding school and content vocabulary, comprehending and doing math problems, and expressing ideas in written form. R. 645. Ms. Guffey noted that B.D. attends help sessions once a week and benefits from simple instruction, chunking tasks, and checks for comprehension. Id. The ALJ found Ms. Guffey's opinion generally persuasive and noted that "B.D. has improved since returning to in-person learning" after the COVID-19 pandemic. R. 27.

Elizabeth Tyree, B.D.'s high school biology teacher, completed a Teacher Questionnaire in March 2021 and found that B.D. had a serious problem understanding school and content vocabulary, understanding and participating in class discussion, learning new material, and applying problem-solving skills in class discussions. R. 635–39. Ms. Tyree noted that B.D. participates in class but often gets the answers wrong. R. 636. She further noted that B.D. "requires A LOT of individual attention" and that the special education teacher "has spent HOURS working one-on-one with him[.]" Id. (emphasis in original). Ms. Tyree stated that she must "explain concepts many times in many different ways (more than average) before he understands them." Id. The ALJ found Ms. Tyree's opinion partially persuasive. R. 28. The ALJ reasoned that Ms. Tyree's opinion is "less consistent with the testimony at the hearing that [B.D.] has improved in his ability to turn in assignments on time and is able to complete tasks such as going to the store with a list and riding public transportation." Id.

### B.  Acquiring and Using Information

Thomasine argues that the ALJ's finding that B.D. does not have a marked limitation in the domain of acquiring and using information is not supported by substantial evidence. Pl.'s Br. at 22, Dkt. 19. Thomasine argues that B.D. receives special education services and that multiple areas of testing in March 2018 "were very low including reading fluency, academic fluency,

math and math calculation skills, academic applications, applied problems, passage comprehension, calculation, sentence reading fluency, and math facts fluency." Id. at 23. Thomasine points to several Teachers Questionnaires that discuss B.D.'s serious limitations in the domain of acquiring and using information and the accommodations B.D. receives in the classroom setting. Id. at 24–26. Finally, Thomasine argues that the ALJ erred by citing normal mental status examinations and average functioning during well-child visits and B.D.'s participation in social activities that would require "some" level of functioning. Id. at 26–27.[5] The Commissioner counters that substantial evidence in the record, including B.D.'s education records that point to improvement in B.D.'s functional abilities, supports the ALJ's finding.

In the domain of acquiring and using information, the Commissioner considers how well a child is able to acquire information, and then use the information learned, including how well a child perceives, thinks about, remembers, and uses information in all settings. See 20 C.F.R. § 416.926a(g); SSR 09–3p. A school-age child without impairment should be able to learn to read, write, do math, and discuss history and science. The child should be able to use increasingly complex language to share information and ideas with individuals or groups, ask questions, express his own ideas, and understand and respond to others' opinions. See 20 C.F.R. § 416.926a(g)(2)(iv); SSR 09-3p.

In evaluating B.D.'s learning disorder, the ALJ notes that "records suggest that both the claimant and his mother denied health concerns during routine visits with treating physicians,

---

[5] Thomasine also argues that the ALJ "did not make a finding regarding the persuasiveness of the opinions rendered by Dr. Betty Gillespie and did not address her testing and opinions when making his findings regarding B.D.'s functioning level regarding acquiring and using information." Pl.'s Br. at 24, Dkt. 19. Thomasine is incorrect. The ALJ specifically addressed Dr. Gillespie's consultative examination and her results. R. 29. The ALJ also explicitly made a finding that to the extent the consultative examination constituted an opinion, it was persuasive and consistent with the record. Id. Thomasine further argues that the ALJ mischaracterized her statement that B.D. has no trouble with teachers. Pl.'s Br. at 26, Dkt. 19. The ALJ misstates Thomasine's position by saying that B.D. had no trouble in class. R. 30. However, this fact alone is not the basis for the ALJ's opinion and is not in and of itself outcome determinative.

12

instead indicating the claimant was capable of participating in sports, interacting with peers, reading, writing stories, and performing household chores." R. 24. The ALJ also reasons that B.D. "typically had average IQ scores, but variable testing results based on his cooperation and performance." Id. The ALJ considered several psychological evaluations collected as part of B.D.'s IEP but reasoned that "the opinions of these educators are generally unpersuasive as they are inconsistent with later submitted evidence showing that the claimant was able to express himself orally but had more trouble with written expression" and "are inconsistent with evidence that the claimant is able to complete tasks such as going to the store with a list and riding public transportation." R. 26.

The ALJ also considered six Teacher Questionnaires but found the opinions of Ms. Duncan, Ms. Whitehead, Ms. Knox, and Ms. Tyree to not be completely persuasive because they were inconsistent with the evidence of record that B.D. could "complete tasks such as going to the store with a list and riding public transportation." R. 27–28. The ALJ additionally found the opinions of Ms. Stow, Ms. Whitehead, and Ms. Knox to not be completely persuasive because "recent evidence show[ed] that the claimant was not as limited in his ability to express his ideas verbally in a clear manner, but continued to have some limitation with written expression." R. 27.

I agree with Thomasine that the ALJ's finding is not supported by substantial evidence. Acquiring and using information considers how well a child is able to acquire information, and then use the information learned, including how well a child perceives, thinks about, remembers, and uses information in all settings. See 20 C.F.R. § 416.926a(g); SSR 09–3p. The ALJ's discussion of normal well-child visits, B.D. and Thomasine's denial of health concerns during visits with treating physicians, B.D.'s ability to participate in sports, interact with peers, perform

13

household chores, follow a list at a store, and ride public transportation are all irrelevant to B.D.'s ability to acquire and use information. The ALJ did not indicate how any of these factors relate to B.D.'s ability to acquire information or perceive, think about, remember, or use that information. As Thomasine notes, five out of six of B.D.'s Teacher Questionnaires indicate that B.D. had limitations in acquiring and using information. R. 493–500, 501–08, 635–39, 644–51, 654–61. Ms. Newkirk, Ms. Leonard, and Ms. Wycoff also found that B.D. had low cognitive abilities compared to his peers. R. 442–44, 462–63, 774–78. It is unclear how using public transportation and a store list or having normal well-child visits undermines these conclusions of teachers, administrators, and providers who interacted with B.D. The ALJ failed to properly evaluate the Teacher Questionnaires and opinions and the record as a whole as they relate to acquiring and using information. The ALJ's decision is simply not supported by substantial evidence.

I recognize that it is not my function to conduct a blank slate review of the evidence by reweighing conflicting evidence, determining credibility, or substituting my judgment for the ALJ's when "reasonable minds could differ." See Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012); Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). In fact, I am precluded from doing so; it is the duty of the ALJ to explain the basis for his opinion. However, here, the ALJ failed to adequately consider B.D.'s limitation in acquiring and using information and relied upon unpersuasive and unsupported reasoning to discount the relevant opinions of the record. Accordingly, I conclude that the ALJ's decision regarding B.D.'s limitation in acquiring and using information is not supported by substantial evidence.[6]

---

[6] Because I find that remand is warranted based on the ALJ's failure to adequately analyze and account for B.D.'s limitations in acquiring and using information, Thomasine's additional allegations of error will not be decided. See Boone v. Barnhart, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments).

## CONCLUSION

For these reasons, an order will be entered **DENYING** the Commissioner's motion for summary judgment, **GRANTING in part** Plaintiff's motion for summary judgment, and **REMANDING** this case to the Commissioner.

Entered: June 12, 2023

*Robert S. Ballou*

Robert S. Ballou
United States District Judge